```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE NORTHERN DISTRICT OF TEXAS
                       DALLAS DIVISION

KELLEY A. KIME,                  §
                                 §
               Plaintiff,        §
                                 §   Civil Action No. 3:04-CV-2170-D
VS.                              §
                                 §
JO ANNE B. BARNHART,             §
Commissioner of Social Security, §
                                 §
               Defendant.        §
```

<u>MEMORANDUM OPINION</u>

Plaintiff Kelley A. Kime ("Kime") brings this action under § 205(g) of the Social Security Act, 42 U.S.C. § 405(g), for review of the final decision of the Commissioner of Social Security ("Commissioner") denying her application for a period of disability and disability insurance benefits under title II of the Act. For the reasons that follow, the court AFFIRMS the Commissioner's decision.

I

At the time of her hearing before an administrative law judge ("ALJ"), Kime was 34 years old. She has a twelfth grade education and past relevant work as a credit clerk, senior credit clerk, and accounting manager. Kime contends that she has been disabled since February 29, 2000 due to deep vein thrombosis ("DVT"), a condition in which blood clots in a deep vein, such as in the legs, pelvis, or arms.

Kime applied for disability insurance benefits on May 7, 2001. Her application was denied on initial consideration and

reconsideration, and she subsequently received a hearing before an ALJ. Kime attended the hearing on May 9, 2002 without counsel. In addition to Kime, a medical expert ("ME") who specializes in internal medicine and cardiovascular disease, and a vocational expert ("VE"), testified. Kime testified to having had multiple surgeries on her legs and explained that she must periodically wear a compression sleeve on her leg to prevent DVT. She also stated that she cannot stand for long periods and, if sitting for long periods, she must take breaks approximately every 90 minutes to stretch her legs. Kime also testified that her treating physician instructed her to keep her left leg elevated to prevent DVT.

The ME testified that Kime's medical impairments did not individually or in combination meet a listing in Appendix 1, Subpart P, Regulation No. 4 of the Social Security Regulations. R. 67. When asked for his opinion as to her RFC, the ME stated:

> The problem I'm having, Your Honor, is the one I told you about, is —— but, let's assume that that's related to her ven[o]us disease. And I think a sedentary RFC with a provision that she can elevate her left leg would be appropriate. And postural restrictions to occasional.

R. 68. In response to a hypothetical question that the ALJ constructed based on the ME's opinion, the VE testified that Kime could not perform her past relevant work if her medical impairment required that she keep her left leg elevated for a period during the day. R. 71. The VE also opined that, if Kime were required to

- 2 -

keep her leg elevated much of the day, there would be no job in the national or regional economy that she could perform.  R. 72.

The ALJ then continued questioning the ME because he "want[ed] to continue the discussion about elevating the leg."  R. 73.  He asked the ME to elaborate on his testimony that he "felt elevating her left leg would be something that would be important." *Id.*  The ME indicated that such a characterization of his testimony might not be accurate, and he stated that he was confused about her symptomatology.  He explained that he had credited her statements that she would experience a burning pain in her leg and that elevating the leg tended to prevent pain.  But he noted that he was unsure what was Kime's medically determinable impairment ("MDI").  The ALJ then asked, apparently in spite of the ME's uncertainty concerning the precise MDI, whether the ME felt, based on what Kime had testified to and what he had seen in the record, that she needed to have her left leg elevated during the daytime if she was working.  The following exchange took place:

> ME:  Well, that hinges on that question.  What is the MDI?  I mean, if we don't have an MDI, we don't have a limitation.
>
> ALJ: So your answer is you don't know?
>
> ME:  I guess.
>
> ALJ: Okay.  You would have no difficulty then, in your opinion based on what you've heard with her sitting at a desk with her feet down, both legs all day.

> ME:  That's correct, with the ability to move her leg and shift position as was stipulated.
>
> ALJ: Such as maybe standing up and stretching?
>
> ME:  That's right.  Or moving her leg while that's — while she's sitting.

R. 73-74.

The ALJ subsequently returned to the VE and posed a hypothetical similar to the one previously posited.  In the question, the ALJ assumed that, instead of having to elevate her left leg, Kime was permitted to stand occasionally and stretch and shift positions while seated.  The VE responded that Kime would be able to perform her past relevant jobs of senior credit administrator and account manager.

Based on this testimony, the ALJ concluded at step four of the five-step sequential evaluation process that Kime is not disabled. He found that Kime has the following impairments: Factor V Leiden (familial disorder), a meniscus tear (residual pain), obesity, and primary nerve trauma (numbness).  R. 11.  He concluded that the impairments are severe but do not meet or equal an impairment in Appendix 1, Subpart P, Regulation No. 4 of the Social Security Regulations.  R. 13.  The ALJ found that Kime has the residual functional capacity ("RFC") to lift ten pounds occasionally, occasionally to lift/carry articles like docket files, ledgers, and smalls tools, to stand for two hours and sit for six hours of an

eight-hour workday, with an opportunity to stretch at 60-90 minute intervals, with no kneeling, squatting, crawling, or balancing ropes, ladders, or machinery, with occasional rest. He concluded that she could perform her past relevant work as a senior credit clerk or accounting manager. R. 13.

                                II

The court's review of the Commissioner's decision is limited to determining whether substantial evidence supports the decision and whether the Commissioner applied the proper legal standards to evaluate the evidence. *Ripley v. Chater*, 67 F.3d 552, 555 (5th Cir. 1995); *Martinez v. Chater*, 64 F.3d 172, 173 (5th Cir. 1995) (per curiam). "The Commissioner's decision is granted great deference and will not be disturbed unless the reviewing court cannot find substantial evidence in the record to support the Commissioner's decision or finds that the Commissioner made an error of law." *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995) (footnotes omitted).

"The court may not reweigh the evidence or try the issues de novo or substitute its judgment for that of the [Commissioner]." *Kane v. Heckler*, 731 F.2d 1216, 1219 (5th Cir. 1984). "If the Commissioner's findings are supported by substantial evidence, then the findings are conclusive and the Commissioner's decision must be affirmed." *Martinez*, 64 F.3d at 173. "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion.'" *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)). "It is more than a mere scintilla, and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993) (citing *Moore v. Sullivan*, 919 F.2d 901, 904 (5th Cir. 1990) (per curiam)). "To make a finding of 'no substantial evidence,' [the court] must conclude that there is a 'conspicuous absence of credible choices' or 'no contrary medical evidence.'" *Dellolio v. Heckler*, 705 F.2d 123, 125 (5th Cir. 1983) (citing *Hemphill v. Weinberger*, 483 F.2d 1137 (5th Cir. 1973)). Even if the court should determine that the evidence preponderates in the claimant's favor, the court must still affirm the Commissioner's findings if there is substantial evidence to support these findings. *See Carry v. Heckler*, 750 F.2d 479, 482 (5th Cir. 1985). The resolution of conflicting evidence is for the Commissioner rather than for this court. *See Patton v. Schweiker*, 697 F.2d 590, 592 (5th Cir. 1983) (per curiam).

To determine whether a claimant is disabled, the Commissioner uses a five-step sequential inquiry. *Leggett*, 67 F.3d at 563; *Martinez*, 64 F.3d at 173-74. The Commissioner must consider whether (1) the claimant is presently working; (2) the claimant's ability to work is significantly limited by a physical or mental impairment; (3) the claimant's impairment meets or equals an impairment listed in Appendix 1, Subpart P, Regulation No. 4; (4)

the impairment prevents the claimant from doing past relevant work; and (5) the claimant cannot presently perform relevant work that exists in significant numbers in the national economy. *Leggett*, 67 F.3d at 563 n.2; *Martinez*, 64 F.3d at 173-74; 20 C.F.R. § 404.1520 (2004).  "The burden of proof is on the claimant for the first four steps, but shifts to the [Commissioner] at step five." *Bowling v. Shalala*, 36 F.3d 431, 435 (5th Cir. 1994) (per curiam) (citing *Anderson v. Sullivan*, 887 F.2d 630, 632-33 (5th Cir. 1989) (per curiam)).  At step five, once the Commissioner demonstrates that other jobs are available to a claimant, the burden of proof shifts to the claimant to rebut this finding.  *Selders v. Sullivan*, 914 F.2d 614, 618 (5th Cir. 1990) (per curiam).

When determining the propriety of a decision of "not disabled," this court's function is to ascertain whether the record considered as a whole contains substantial evidence that supports the final decision of the Commissioner, as trier of fact.  The court weighs four elements of proof to decide if there is substantial evidence of disability: (1) objective medical facts; (2) diagnoses and opinions of treating and examining physicians; (3) the claimant's subjective evidence of pain and disability; and (4) age, education, and work history.  *Martinez*, 64 F.3d at 174 (citing *Wren v. Sullivan*, 925 F.2d 123, 126 (5th Cir. 1991) (per curiam)).

The ALJ has a duty to develop the facts fully and fairly

relating to an applicant's claim for disability benefits. *Ripley*, 67 F.3d at 557. "If the ALJ does not satisfy this duty, [the] decision is not substantially justified." *Id.* Reversal of the ALJ's decision is appropriate, however, only if the applicant shows that she was prejudiced. *Id.* The court will not overturn a procedurally imperfect administrative ruling unless the substantive rights of a party have been prejudiced. *See Smith v. Chater*, 962 F. Supp. 980, 984 (N.D. Tex. 1997) (Fitzwater, J.).

III

Kime advances two arguments in support of reversing the Commissioner's decision.

A

In the first, in which she posits that the ALJ's "decision is wrong in many respects," P. Br. at 3, Kime simply lists five grounds (four ALJ statements and one ME failure to describe a venous insufficiency) that she challenges as erroneous. She fails, however, to demonstrate why these alleged errors are reversible, even if they are assumed to be erroneous. Accordingly, Kime is not entitled to relief on any ground set out under her first argument.

B

1

In her second argument, Kime contends that the opinions of the ME, Howard H. McClure, Jr., M.D., are contradictory, and that this led the ALJ to reach the wrong decision.

Kime cites evidence that she saw one of her treating physicians, Donald S. Mierzwiak, M.D. ("Dr. Mierzwiak"), a cardiologist, in April 2001 and again at least once monthly for physical therapy. She states that she suffers from chronic DVT that requires that she take Coumadin, a blood thinner. According to Kime, her condition precludes her from sitting more than one and one-half hours without standing and stretching her leg for 15-20 minutes, and she must walk around for about 20 minutes before she can sit down again. She also testified during the hearing that she is still having problems with her knee. Kime points to the ME's testimony that Kime's medical problem is more likely to occur at work than at home; that the requirement that she take Coumadin on a long-term basis is a liability, that bleeding and the ability to bruise are potential problems, and that her excessive menstrual periods are probably related to her use of the drug; and that a sedentary RFC with provisions that she elevate her left leg, and postural restrictions, would be appropriate. Based on the ME's opinion, and in response to the ALJ's hypothetical that incorporated the limitations found in the opinion, the VE opined that there were no jobs in the national or regional economy that Kime could perform if she were required to elevate her left leg. R. 72.

Kime complains that the VE's opinion should have ended the case. Instead, in response to further questioning from the ALJ,

the ME changed his opinion concerning the necessity that Kime elevate her left leg during the day.  He opined that Kime could sit all day at a desk, with her feet down, provided she could move her leg and shift her position.  The ALJ then altered the hypothetical to the VE, inquiring whether Kime could perform her past relevant work if permitted occasionally to stand up and stretch.  The VE opined that Kime could perform her past relevant work.

Kime posits that there was no basis to change the hypothetical, and that the change was based on the ME's response of "I guess" to the question, "So your answer is you don't know?"  She points to evidence that, at the last job she held, she worked for four weeks with her legs down, moved around occasionally, and still passed a blood clot.  Kime maintains that the ME's apparent unsupported change in his medical opinion testimony should not have been the basis for the ALJ to alter his hypothetical to the VE, because it goes against her testimony and the substantial weight of the medical evidence. Kime cites Dr. Mierzwiak's October 13, 2000 letter, in which he assessed her condition and stated that she had been placed on bed rest due to a blood clot in her leg, she was to elevate her leg whenever possible, and was allowed only limited "up" time, because of the possibility that a clot could dislodge and travel through her body, and he opined that her condition was quite serious.

Kime also argues that the ME's change of opinion is completely

contradictory and therefore capricious.  She reasons that the ME initially opined that she had a sedentary RFC, provided she could elevate her leg, then changed his conclusion to opine that she need not elevate her leg for a certain amount of time each day.

The Commissioner maintains that the ALJ's decision is proper. Perhaps in an attempt to establish that the ALJ adequately evaluated the medical evidence in the record, she discusses evidence that the ALJ noted from Phillip M. Graehl, M.D., Dr. Mierzwiak, Cynthia Rutherford, M.D. ("Dr. Rutherford"), and the ME. She points out that the ME concluded that Kime did not need to elevate her leg to work if she could move her leg, shift positions, and stand up and stretch.  Responding to Kime's complaint that the ME changed his initial opinion that she would need to elevate her leg during the workday, the Commissioner maintains that the ALJ properly relied on the ME's opinion.  She posits that the ME stated that he did not know whether there was an MDI that would  cause such a limitation, and that he believed that, if Kime could move her legs, shift positions, and stretch, this would compensate for all her limitations.  The Commissioner contends the ME is a specialist in cardiovascular diseases and internal medicine, he reviewed all the evidence and questioned Kime before concluding that there was no medical necessity for her to elevate her leg at work, and the fact of her weight loss, medication dosages, and monitoring, and the fact that she had no surgeries planned,

- 11 -

supported the ALJ's decision that the record evidence did not support a finding that Kime could perform no work activities.

Responding to Kime's contention that the ALJ improperly changed the hypothetical question, the Commissioner asserts that it is not error for an ALJ to ask as many questions as he thinks are necessary to evaluate a case properly. She also posits that the ME's expert testimony conflicted only with Kime's subjective complaints, not with any other medical opinion, and the ALJ was not obligated to believe Kime's complaints. She asserts that Dr. Rutherford, a specialist in internal medicine and hematology, did not opine that Kime was required to elevate her leg or that she could perform limited work activities because of hypercoagulability or other conditions that caused Kime's leg problems.

Responding to Dr. Mierzwiak's October 13, 2000 letter that Kime was placed on bed rest due to a blood clot in her leg and that she was to elevate her leg at all times possible, the Commissioner contends that a review of other notes from the doctor shows that on November 6, 2000 an MRI revealed that the blood clot had resolved, meaning that Dr. Mierzwiak's opinion concerned a temporary need for Kime to elevate her leg.

The Commissioner posits that the ALJ properly re-framed the hypothetical posed to the VE, based on all of Kime's limitations supported by the evidence and recognized by the ALJ, that his reliance on the VE's opinion that Kime can perform her past

relevant work is also proper, and that his step four decision is supported by substantial evidence.

                                2

Kime has failed to demonstrate that the ALJ erred by developing additional testimony in which the ME changed his opinion concerning her limitations.  She has cited no authority that suggests that an ALJ is obligated to accept an ME's hearing testimony without probing further.  In fact, the ALJ "has the duty, accentuated in the absence of counsel, to develop the facts fully and fairly and to probe conscientiously for all of the relevant information." *Ware v. Schweiker*, 651 F.2d 408, 414 (5th Cir. Unit A July 1981) (citations omitted).

Moreover, when the ME's testimony is considered in its entirety, the ALJ's decision to revisit the ME's opinion is fully justified.  The ME lacked confidence in his initial opinion due to what he perceived to be atypical episodes of burning pain connected with what Kime called phlebitis.  This lack of conviction appeared to be the result of ambiguities in Kime's testimony regarding whether one of her treating physicians assumed her condition is subliminal phlebitis or venous in origin, and to the failure of the Social Security Regulations, by and large, to recognize her liability for a medical problem as an MDI.  *See* R. 61-62.  The ME did opine that Kime had a medical problem that was more likely to recur in a work setting than at home, and that it was a liability,

but he also appeared to state that working would neither cause nor prevent the problem. *See* R. 62. The ME also listed as medical factors Factor V Leiden, a meniscus tear, mild obesity, and perineal nerve trap, R. 63; he opined that taking Coumadin long term was a liability, leading to potential problems of bleeding and easy bruisability, but "not a for sure effect," *id.*; he stated that venous insufficiency of the lower extremity that results in swelling should not result in restrictions unless there is excessive swelling, which is usually controlled with a compression garment, R. 64-65, and he opined concerning thrombosis illness (blood clot) that the illness would persist and that Kime must take her medication, but that he remained confused about the episodes she experienced with almost daily burning up and down her whole leg. R. 65-66. And when the ALJ asked that the ME opine concerning Kime's exertional level, the ME reiterated his previously-stated difficulty ("The problem I'm having, Your Honor, is the one I told you about[.]"), he then assumed a relationship to her venous disease, and he concluded that a sedentary RFC with a provision that she elevate her left leg, with occasional postural restrictions, would be appropriate. R. 68. In another words, the ME was not without some uncertainty and difficulty in reaching a conclusion in the first place. The ALJ's decision to probe further, even after seeking the VE's opinion based on the ME's opinion, is supported by the record.

3

Nor is Kime correct in her assertion that there was no basis to change the hypothetical to the VE and that the change was based on the ME's response of "I guess."

First, once the ME changed his opinion concerning Kime's limitations, the ALJ properly altered the hypothetical to include them. *See Bowling*, 36 F.3d at 436 (holding that proper hypothetical question to VE contains limitations found by ALJ).

Second, a fair reading of the ME's testimony demonstrates that the ALJ did not reconstitute the hypothetical based only on the ME's response of "I guess." Considered in its entire context, the ME's answer is part of several responses to questions in which the ME expressed doubt about whether Kime has an MDI at all and opined that she could in fact sit at a desk with both legs and feet down all day, so long as she was able to move her leg and shift positions. The ME testified that he was confused about her symptomatology, but he accepted her assertion that when she sits or stands she gets burning pain, and that elevating her leg tends to prevent it. Despite this assumption, he was still unsure what is her MDI. When asked by the ALJ whether, based on what Kime had testified to and what the ME had seen in the record, he felt she needed to have her left leg elevated during the daytime if working a job, the ME reiterated that his answer depended on the question, "What is the MDI?" R. 73. He then stated, "I mean, if we don't

have an MDI, we don't have a limitation." *Id.* When the ALJ then asked, "So your answer is you don't know," and the ME responded, "I guess," R. 74, the ME was in effect stating that he guessed he did not know whether she needed to elevate her left leg while at work. He did not, however, retreat from his fundamental doubt whether she had a recognized MDI. When in the very next question the ALJ inquired whether the ME would have difficulty with Kime's sitting at a desk with both legs and feet down all day, the ME opined that he would not, provided she was able to move her leg and shift positions. *See id.* at 73-74. Considered in context, the ALJ could reasonably have found that the ME was not merely guessing whether Kime should be able to elevate her leg while at work, but was expressing uncertainty about whether she even has an MDI that necessitated that she elevate her left leg, and was opining that she could sit at a desk with her legs and feet down all day, provided she was able to move her leg and shift positions.

4

Kime's reliance on evidence that, at the last job she held, she worked for four weeks with her legs down, moved around occasionally, and still passed a blood clot, and her contention that the second hypothetical posed to the VE goes against her testimony and the substantial weight of the medical evidence, are insufficient to warrant reversing the Commissioner's decision. The ALJ was entitled to credit other medical testimony, rather than

- 16 -

Kime's, that supported his conclusion that she can perform her past relevant work. He was also entitled to credit the evidence that supported his findings. The resolution of conflicting evidence is for the Commissioner. *See Patton*, 697 F.2d at 592. And as the Commissioner points out, this is not a case in which the ME's medical opinion conflicted with another medical opinion of record. *Cf., e.g., Myers v. Apfel*, 238 F.3d 617, 621 (5th Cir. 2001) (per curiam) ("This is a case where the ALJ summarily rejected the opinions of [Myers's] treating physician, based only on the testimony of a non-specialty medical expert who had not examined the claimant." (quoting *Newton v. Apfel*, 209 F.3d 448, 458 (5th Cir. 2000))).

5

Finally, Kime's reliance on Dr. Mierzwiak's October 13, 2000 letter is insufficient to warrant reversing the ALJ's conclusions. Kime cites the letter without taking into account other record evidence from Dr. Mierzwiak's records. In a November 6, 2000 letter to James B. Montgomery, M.D., Dr. Mierzwiak advised him that a recent MRI revealed that the blood clot had resolved and that knee surgery could proceed. The ALJ did not err in failing to give the October 13, 2000 letter the weight Kime thinks it deserves.

6

Kime's argument that the ME's change of opinion is completely contradictory and capricious fails for the reasons discussed *supra*

at § III(B)(3). Considered in its totality, the ME's testimony reflects his consistent confusion about Kime's symptomatology and his uncertainty whether she even has an MDI and needs to elevate her left leg while at work. Although the ME came to a different conclusion on further questioning, his doubts about whether Kime has physical limitations that preclude her performing her past relevant work were manifest at the time he offered his first opinion during the hearing.

*   *   *

Kime has failed to demonstrate that the Commissioner committed reversible error in denying disability benefits in this case. Accordingly, the Commissioner's decision is AFFIRMED.

July 15, 2005.

_____
SIDNEY A. FITZWATER
UNITED STATES DISTRICT JUDGE

- 18 -